UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH SALSGIVER, | ) | CASE NO. 1:11-CV-351 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE MCHARGH |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| Defendant. | ) | |

This case is before the undersigned pursuant to the consent of the parties. (Doc. 15). The issue before the undersigned is whether the final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff Deborah Salsgiver's applications for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., is supported by substantial evidence and therefore, conclusive.

For the reasons set forth below, the Court VACATES the decision of the Commissioner and REMANDS the case back to the Social Security Administration.

## I. INTRODUCTION & PROCEDURAL HISTORY

Plaintiff Deborah Salsgiver ("Plaintiff" or "Salsgiver") originally applied for Disability Insurance benefits and Supplemental Security Income benefits on June 21, 2001, alleging that she had become disabled on March 28, 2001. (Tr. 106). Salsgiver's applications were denied initially and upon reconsideration. (*Id.*) An administrative law judge later reviewed Plaintiff's application anew, but on September 24, 2004, also denied her applications. (Tr. 106-14). Plaintiff did not appeal this decision.

On November 8, 2006, Plaintiff protectively re-applied for a Period of Disability and Disability Insurance benefits and Supplemental Security Income benefits again alleging that she became disabled on March 28, 2001 due to suffering from fibromyalgia, panic attacks, anxiety disorder, obsessive compulsive disorder ("OCD"), post traumatic stress disorder, sciatica, degenerative disc disease, a herniated disc, manic depression and a separated left shoulder.  (Tr. 120-23, 185-95, 209).  These applications were also denied initially and on reconsideration. (Tr. 120-23).  Thereafter, Plaintiff requested a hearing to contest the denial of her applications.  (Tr. 158).  The Social Security Administration granted Plaintiff's request and scheduled a hearing. (Tr. 164-76).

On August 27, 2009, an Administrative Law Judge (the "ALJ") convened a hearing to evaluate Plaintiff's current applications.  (Tr. 30-68).  Plaintiff appeared at the hearing with counsel and testified before the ALJ.  (*Id*.).  Medical expert, Dr. Robert Newman (the "ME"), and vocational expert, Mr. Ted Macy (the "VE"), also appeared and testified at the proceeding. (*Id*.).  During the hearing, Plaintiff amended her disability onset date from March 28, 2001 to September 24, 2004.  (Tr. 32).

On September 29, 2009, the ALJ issued her decision and determined that Salsgiver was not disabled.  (Tr. 16-29).  Following this decision, Plaintiff sought review of the ALJ's decision from the Appeals Council.  (Tr. 9).  However, the council denied Plaintiff's request, thereby making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4).  Salsgiver now seeks judicial review of the Commissioner's final decision denying her most recent request for benefits pursuant to 42 U.S.C. § 405(g) and 1383(c).

Salsgiver, born on September 30, 1968, was 35 years old as of her amended onset date of September 24, 2004.  (Tr. 120).  Therefore, at all relevant times, Salsgiver has been considered a

"younger" person for Social Security purposes.[1]  *See* 20 C.F.R.  §§ 404.1563(c); 416.963(c).
Plaintiff completed the twelfth grade and her past relevant work history consists of working as a
waitress.  (Tr. 218, 62).

## II.  MEDICAL EVIDENCE[2]

Dr. David Keith treated Plaintiff between 2005 and 2006.  (Tr. 360-66).  He noted that
Plaintiff suffered from abdominal pain, fibromyalgia, neuropathy, lower back pain and radicular
bilateral leg pain.  (*Id.*).    In February 2006, Dr. Keith ordered Plaintiff to undergo magnetic
resonance imaging ("MRI") of her lower back.  (Tr. 365).  The MRI revealed degenerative disc
disease and a "small central disc protrusion, consistent with subligamentous herniation" at L5
and S1.  (*Id.*).

In December 2005, Plaintiff presented to Dr. David Moskovitz, M.D. for a psychiatric
evaluation at the Portage Path Behavioral Health center.  (Tr. 357-58).  Dr. Moskovitz diagnosed
Salsgiver with panic disorder with agoraphobia, OCD, depressive disorder, fibromyalgia and
headaches.  (*Id.*).  During the examination, the doctor noted that Plaintiff's mood was somewhat
anxious, but that her attention, concentration, intellect and judgment seemed fair or average.  (Tr.
358).  However, Dr. Moskovitz noted that Plaintiff was visibly shaking throughout the interview.
(*Id.*).

---

[1]  The Court notes that the ALJ indicated that Plaintiff later progressed into the "closely
approaching advanced age" category.  (Tr. 27).  This group refers to individuals between the
ages of 50 and 54.  20 C.F.R §§ 404.1563(d); 416.963(d).  As of the date of this opinion, Plaintiff
is 43 years old.   Thus, Plaintiff has not yet progressed in age to constitute as a member of the
"closely approaching advanced age" group.

[2]  The evidence cited herein is not intended to reflect the entirety of the medical evidence
presented to the Court or to the ALJ.  The Court's summary of the medical evidence mostly
focuses on the evidence which the Court found central to issuing its ruling.

Salsgiver began receiving treatment from Dr. Khaleel Deeb on August 3, 2006.  (Tr. 332).  Plaintiff complained of problems with anxiety, depression, shakiness and difficulty sleeping.  Dr. Deeb opined that Plaintiff suffered from depression, anxiety and chronic obstructive pulmonary disease ("COPD").  (*Id.*).  Dr. Deeb continued to treat Plaintiff regularly throughout 2006.  In March 2007, he referred her to pain management because she continued to experience pain radiating from her neck to her back.  (Tr. 329).  However, his treatment note commented that Plaintiff's anxiety had become fairly well-controlled.  (*Id.*).  When Plaintiff presented back to Dr. Deeb on April 2, 2007, he noted that her legs and feet had a purplish color.  (Tr. 328).  Salsgiver told the doctor that she could not walk one block without experiencing pain.

On June 14, 2006, Plaintiff presented to Parma Community General Hospital after she fell from tripping over one of her daughter's toys.  (Tr. 321).  She was diagnosed with a chest wall contusion, right cervical sprain and exacerbation of her chronic low back pain.  (*Id.*).  She went back to the hospital in October 2006 complaining of pain in her shoulder.  (Tr. 310).  Examination revealed a full range of motion, but with some discomfort, and doctors prescribed her pain medication.  (Tr. 311).

On April 3, 2007, Salsgiver was seen by Dr. Leticia Ugarte for complaints of depression, anxiety, panic attacks and OCD.  (Tr. 340-51).  Dr. Ugarte noted that Plaintiff had a past medical history of OCD, myalgias and anxiety disorder, and diagnosed her with major depression, anxiety disorder, panic disorder, eating disorder and OCD.  (Tr. 343, 346).

Plaintiff also received treatment from Dr. Emmanuelle Duterte, a psychiatrist.  She first presented to Dr. Duterte on May 16, 2007.  (Tr. 443).  On that date, Plaintiff reported feeling well and indicated that her anxiety was "overall better."  (*Id.*).  The doctor also noted that Salsgiver felt that her medications were working well.  (*Id.*).  After reviewing Plaintiff's medical

4

history, Dr. Duterte diagnosed Salsgiver with major depressive disorder, generalized anxiety disorder, OCD and an eating disorder. (Tr. 444). Salsgiver presented back to Dr. Duterte on July 3, 2007. (Tr. 446). She reported feeling more anxious, difficulty sleeping and having a poor appetite. (*Id*.). Plaintiff also admitted to sometimes taking more medication than what she was prescribed. (*Id*.).

On May 22, 2007, Plaintiff presented to Dr. Rami Hachwi, a neurologist, to whom she was referred by Dr. Deeb. (Tr. 401-02). Dr. Hachwi performed electromyography ("EMG") testing on Plaintiff to evaluate her complaints of chronic pain in her back and legs. (Tr. 401, 398-99). Dr. Hachwi concluded that Plaintiff's test results showed abnormal EMG findings in her bilateral lower extremities. (Tr. 399). He indicated that the evidence revealed "chronic axonal peripheral polyneuropathy with no active denervation." (*Id*.).

On May 31, 2007, state agency physician, Dr. Kristen Haskins, a psychologist, completed a "Mental Residual Functional Capacity Assessment" form and a "Psychiatric Review Technique" form evaluating Salsgiver's mental status based upon the doctor's review of Salsgiver's medical record. (Tr. 369-87). Pursuant to Acquiescence Ruling 98-4, Dr. Haskins adopted the restrictions announced by the prior ALJ, limiting Plaintiff to "non-public, low-stress tasks." (Tr. 385, 113). On August 23, 2007, Dr. Karen Stailey-Steiger, Ph.D., affirmed Dr. Haskins' findings as written. (Tr. 487).

State agency physician, Dr. Esberdado Villanueva, assessed Plaintiff's physical residual functional capacity ("RFC") on June 15, 2007. (Tr. 389-95). He concluded that Salsgiver retained the ability to lift and/or carry 10 pounds frequently and 20 pounds occasionally, and to push or pull an unlimited amount of weight. (Tr. 389). The doctor also noted that Plaintiff could

sit, stand or walk for roughly six hours each work day.  (*Id*.).  Dr. Villanueva noted that his findings were an adoption of the RFC announced by the prior ALJ.  (*Id*.).

On July 31, 2007, Dr. Duterte completed a "Medical Source Statement" evaluating Salsgiver's mental capacity.  (Tr. 485-86).  Dr. Duterte rated Plaintiff as "good" or "fair" in her mental capacity to: follow work rules; use judgment; maintain attention and concentration for extended periods of two hour segments; respond appropriately to changes in a routine setting; maintain regular attendance and be punctual within customary tolerances; deal with the public; relate to co-workers; interact with supervisors; function independently without special supervision; understand, remember and carry out complex and simple job instructions; understand, remember and carry out detailed, but not complex job instructions; maintain her appearance; socialize; behave in an emotionally stable manner; relate predictably in social situations; manage funds/schedules; and leave home on her own.  (*Id*.).  The form described "good" as the "[a]bility to function in th[e] area is limited, but satisfactory"; whereas a "fair" rating indicated that the "[a]bility to function in th[e] area [wa]s seriously limited, but not precluded[, although the individual] [m]ay need special consideration and attention."  (Tr. 485).

However, the doctor opined that Salsgiver had "poor or no" ability to: work in coordination with or proximity to others without being unduly distracted or distracting; deal with work stresses; and to complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 485-86).  The form indicated that one with "poor or no" ability in a given area signified that the individual had "[n]o useful ability to function in a competitive setting[, but]  [m]ay be able to perform in a sheltered setting."  (Tr. 485).

Dr. Deeb also evaluated Plaintiff's physical capacity for work on July 31, 2007.  (Tr. 462-63).  Dr. Deeb opined that Plaintiff was unable to perform any lifting or carrying.  (Tr. 462).  He also noted that she was restricted from standing or walking for uninterrupted periods longer than 15 minutes, or from sitting longer than 30 minutes at a time.  (*Id*.).  Dr. Deeb commented that these restrictions were necessary due to Plaintiff's problems with severe neuropathy, fibromyalgia and OCD.  (*Id*.).  Furthermore, he concluded that Salsgiver should rarely or never: climb, balance, stoop, crouch, kneel, crawl, reach, handle, feel, push, pull, or perform fine or gross manipulation.  (Tr. 463).

On September 7, 2007, state agency physician, Dr. John Starr, reviewed Salsgiver's medical record, including Dr. Deeb's findings, and assessed Salsgiver's physical functionality.  (Tr. 488).  Dr. Starr concluded that Dr. Deeb's opinions were unsupported by his own or any other doctor's findings.  (*Id*.).  Instead, Dr. Starr adopted the RFC assessment of Dr. Villanueva finding that Plaintiff had the capacity to perform light work as defined in the Social Security regulations.  (*Id*.).

On June 15, 2008, Plaintiff fell into a fire pit and suffered third degree burns to her left arm, back, abdomen and left thigh.  (Tr. 629-30).  On June 18, 2008, she underwent surgery to help her skin heal.  (*Id*.).  Plaintiff remained in the hospital until July 1, 2008.  (Tr. 628).  Salsgiver began occupational therapy in September 2008 to improve her range of motion and functional strength.  (Tr. 586-88).

Plaintiff was also hospitalized in September 2008, for what was presumed to be a suicide attempt.  (Tr. 490-92).  Plaintiff was admitted to the hospital after taking 20 Zoloft pills, but denied that her actions amounted to a suicide attempt.  (Tr. 490)  She received treatment at the hospital for approximately seven days.  (*Id*.).  Upon discharge, the hospital noted that Plaintiff

was in stable condition, but diagnosed her with bipolar disorder, alcohol dependence and OCD. (Tr. 491).

### III.  PLAINTIFF's TESTIMONY

Plaintiff testified that she has one daughter who she cared for until age 11.  (Tr. 36). During that time, Salsgiver was able to help her daughter prepare for school, cook meals, and assist with homework in the evenings.  (Tr. 37).  Salsgiver testified that she was able to do laundry at times, but received assistance from her fiancé with lifting baskets of clothes.  (Tr. 39). Plaintiff stated that she had just begun attending alcohol treatment after some difficulty getting into the program and finding a counselor.  (Tr. 40-42).  She stated that she started attending the Cleveland Institute of Medical Message in December 2008, but was forced to stop classes after being jailed for violating a restraining order her ex-husband had in place.  (Tr. 42-43).  But, she expressed interest in re-enrolling in classes.  (Tr. 43).

Salsgiver indicated that she could occasionally go out and shop for groceries, as long as she was not shopping for a full month's worth of groceries.  (Tr. 44-45).  She also stated that she could wash dishes, prepare meals in the microwave and crock pot, care for her own personal hygiene needs, and drive to doctor's appointments.  (Tr. 45).  However, due to her fibromyalgia, she noted that she experienced good days and bad days when she could not get out of bed.  (Tr. 46).  She estimated that she experienced approximately 10 bad days a month between 2006 and 2009.  (Tr. 47-48).  Salsgiver indicated that her fibromyalgia was the most disabling problem from which she suffered.  (Tr. 48).  Plaintiff also noted that she suffered from chronic pain in her neck which hurt on a consistent basis.  (Tr. 48-49).  Additionally, she testified that she had to wear compressive garments on her left leg and arm at night time due to her burns.  (Tr. 50-51).

## IV.  MEDICAL EXPERT TESTIMONY

Dr. Robert Newman testified at the proceeding as the medical expert.  (Tr. 49-61).  He initially noted Plaintiff's history of problems with the burns she suffered to her body.  (Tr. 50).  He also noted that Plaintiff suffered from depression, although he refused to comment further, acknowledging that he was not a psychiatrist.  (Tr. 53).  With regard to Plaintiff's fibromyalgia, the ME explained that there are no signs or symptoms generally used to diagnose this condition.  (*Id.*).  The ME added that the trigger points tested to measure the severity of the condition can sometimes yield unreliable results because pain is subjective.  (*Id.*).  Therefore, he asserted that he "d[id not] know how to evaluate its intensity or severity."  (*Id.*).  However, the ME confirmed that Plaintiff's fibromyalgia was a severe impairment, although he did not find her chronic pain to meet listing level.  (*Id.*).  Finally, he noted that Plaintiff also suffered from substance abuse, but he did not believe that this dependency had any impact on Plaintiff's ailments.  (Tr. 53, 55-57).

Originally, the ME testified that Plaintiff retained the ability to perform light work consisting of lifting 20 pounds occasionally and 10 pounds frequently, except he did not feel that Plaintiff could perform a job requiring her to be on her feet for an uninterrupted period of six hours.  (Tr. 57-58).  However, upon questioning by Plaintiff's attorney, the ME acknowledged that there was evidence in the record showing that Plaintiff required further restrictions.  (Tr. 59).  The ME confirmed that the EMG performed by Dr. Hachwi showed abnormal results suggestive of bilateral radiculopathy in Plaintiff's lower extremities which would further restrict Plaintiff's ability to sit and stand.  (Tr. 59-60).  Therefore, the ME opined that Plaintiff could only sit or stand for four hours each workday.  (Tr. 60-61).

## V.  <u>VOCATIONAL EXPERT TESTIMONY</u>

Vocational exert, Ted Macy, testified at the hearing before the ALJ.  (Tr. 62-68).  The VE testified that Plaintiff's prior position as a waitress was considered as a "light semiskilled job." (Tr. 63).  It was the only position held by Salsgiver which constituted as substantial gainful activity by Social Security standards.  (Tr. 62).  The ALJ posed a series of hypothetical questions to the VE.

The first question posed asked the VE to consider a hypothetical individual with Salsgiver's profile and education, having the ability to lift up to 20 pounds occasionally and 10 pounds frequently, and to stand or walk for roughly six hours each workday with normal breaks. (Tr. 63-64).  The ALJ further limited this person to nonpublic, low-stress tasks.  (Tr. 64).  The VE answered that such a person would not be able to work as a waitress, but would be able to work as a bench assembler, wire worker or final assembler.  (Tr. 64).

Next, the ALJ asked the VE to consider the same hypothetical individual, but to include the additional restriction that the person be "limited to superficial interaction with the general public, coworkers, and supervisors".  (Tr. 64-65).  The VE responded that the individual would be able to perform the same jobs previously identified.  (*Id.*).

The ALJ posed a third question to the VE again referencing the hypothetical person described in his first question.  (Tr. 65).  However, the ALJ limited this person to no more than four hours of standing, sitting or walking in an eight-hour day.  (*Id.*).  The VE confirmed that this individual would be able to perform the jobs he previously identified, although there would be a reduction in the number of jobs available due to the limitation on the person's ability to stand and walk.  (Tr. 65-66).  The VE also verified that these positions would remain available even if

10

the person were limited to only superficial contact with the public, coworkers and supervisors. (Tr. 66).

Lastly, the VE opined that there would not be any jobs available to a person who would be off task 20 percent of the workday, or who would miss five to six days of work each month. (Tr. 67-68).

## VI.  ALJ's RULING

The ALJ made the following relevant findings of fact and conclusions of law.  The ALJ initially noted that the ruling in *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), governed her decision with respect to Plaintiff's disabled status from her onset date through July 1, 2007.  (Tr. 17).  The ALJ explained that the prior ALJ's decision controlled her disposition of Salsgiver's applications up until that time because Plaintiff had failed to show a change in her condition from the date of the prior ALJ's decision through July 2, 2007.  (*Id*.). At the first step of the five-step sequential analysis,[3] the ALJ ruled that Plaintiff had not engaged

---

[3] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. § § 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)     If a claimant is doing substantial gainful activity – i.e., working for profit – she is not disabled.

(2)     If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)     If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)     If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

in substantial gainful activity since her amended onset date of September 24, 2004.  (Tr. 19).  At step two, the ALJ found that Plaintiff suffered from the following severe impairments through July 1, 2007:  fibromyalgia, degenerative disc disease, major depressive disorder, recurrent, moderate, without psychosis, anxiety disorder with panic attacks, without agoraphobia, OCD, eating disorder, and substance addiction disorder.  (*Id.*).  However, after that date, the ALJ also found Plaintiff's axonal peripheral polyneuropathy to be a severe impairment.  (*Id.*).  Next, at step three, the ALJ determined that none of Plaintiff's impairments, individually or combined, met or equaled one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 20-21).

Before moving to the fourth stage of the disability evaluation process, the ALJ assessed Plaintiff's RFC to work.  The ALJ found that Salsgiver retained the RFC to:

> [L]ift, carry, push and/or pull 20 pounds occasionally and 10 pounds frequently. In an eight-hour day, she can sit, stand, and walk, each, for six hours.  She is limited to non-public, low-stress tasks.  Beginning July 2, 2007, Ms. Salsgiver can perform light work with restrictions.  She is able to lift, carry, push and/or pull 20 pounds occasionally and 10 pounds frequently.  In an eight-hour workday, she can sit, stand, and walk, each, for four hours.  She is limited to non-public low-stress jobs with no more than superficial interaction with supervisors, co-workers, and the public.

(Tr. 21).  Accordingly, at step four, the ALJ concluded that Plaintiff could not perform her past relevant work as a waitress because the job required a greater RFC than that which Salsgiver retained.  (Tr. 27).  Notwithstanding this finding, at the final step in the analysis, the ALJ held that Plaintiff still retained to the capacity to perform other work existing in significant numbers

---

(5)     Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

in the national economy, such as a bench assembler, wire worker, or final assembler.  (Tr. 27-28).  Therefore, the ALJ concluded that Salsgiver was not disabled.

## VII.  DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. § § 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. § §  404.1505, 416.905.

## VIII.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001)*; Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed*. Id.*  The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)*; Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.

13

1983).  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387.  However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## IX.  ANALYSIS

Salsgiver's objections to the ALJ's opinion can be grouped into two categories.  First, Plaintiff objects to the ALJ's treatment of the medical opinion evidence, particularly with respect to the opinions of Plaintiff's physicians, Dr. Khaleel Deeb and Dr. Emmanuelle Duterte.  Second, Salsgiver challenges the ALJ's application of the ruling in *Drummond* with respect to her disabled status for the time period of September 24, 2004, through, July 1, 2007.

### A.  Medical Opinion Evidence

It is well-established that an ALJ must give special attention to the findings of a claimant's treating sources.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  This doctrine, referred to as the "treating source rule" recognizes that physicians who have a long-standing relationship with an individual are best-equipped to provide a complete picture of the person's health and treatment history.  *Id*; 20 C.F.R. § 416.927(c)(2).[4]  Opinions from such physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record."  *Wilson*, 378 F.3d at 544.

---

[4] Effective March 26, 2012, Sections 404.1527 and 416.927 of the Code of Federal Register were amended.  Paragraph (d) of each section was redesignated as paragraph (c).  *See* 77 F.R. 10651-01, 2011 WL 7404303.

When a treating source's opinion is not given controlling weight, the ALJ must consider several factors to determine what weight the opinion should be afforded.  These factors include: the length of the treatment relationship, the nature and extent of the treatment, how well the physician's opinions are supported by other medical evidence, the extent to which the physician's opinions are consistent with the record as a whole, whether the physician is an expert in the particular field of practice for which he/she is treating the claimant, and any other factor which may support or contradict the opinion.  20 C.F.R §§ 416.927(c)(2)-(6); 404.1527(c)(2)-(6). Moreover, the regulations require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinions.  *Id*.

### 1. Dr. Deeb

In the instant case, the ALJ indicated that he assigned less weight to the opinions of Plaintiff's treating physician, Dr. Khaleel Deeb, because they were not "supported by [Dr. Deeb's] own treatment records and [were] inconsistent with the evidence as a whole."  (Tr. 23). In explaining this statement, the ALJ noted the record showed that Plaintiff retained full motor strength and reflexes, and that her sensation was intact.  The ALJ contrasted these findings with Dr. Deeb's opinion, which the ALJ characterized as labeling Plaintiff "essentially bedridden". (*Id*.).  The ALJ also held that Dr. Deeb's opinion was inconsistent with Salsgiver's ability to perform various activities of daily living, and the ME's testimony.

Plaintiff argues that the ALJ discounted Dr. Deeb's opinion on improper bases.  Because Plaintiff suffers from fibromyalgia, she maintains that the ALJ's stated reasons for discrediting Dr. Deeb's opinion are not in accord with Sixth Circuit case law regarding how fibromyalgia is evaluated.

In *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 243-44 (6th Cir. 2007), the Sixth Circuit acknowledged that fibromyalgia could constitute as a disabling condition. The Court described the disease as "elusive" and "mysterious" because unlike medical conditions which can be verified through objective testing, "fibromyalgia patients present no objectively alarming signs." *Id.* (*citing Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) and *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003)). Instead, "fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have a full range of motion.'" *Rogers*, 486 F.3d at 244 (*citing Preston*, 854 F.2d at 820). The ALJ in *Rogers* rejected the opinions of the claimant's treating physician regarding the severity of her fibromyalgia. *Id.* at 245. Instead of crediting the opinions of this doctor, the ALJ relied on the opinions of two state agency reviewing physicians, neither of which had physically examined Plaintiff. *Id.* The state agency doctors questioned the treating physician's statements regarding the severity of the claimant's fibromyalgia specifically because of the lack of objective medical evidence in the record corroborating the physician's findings. *Id.* But, the Sixth Circuit held that it was not proper for the ALJ to credit their opinions regarding Plaintiff's fibromyalgia because "opinions that focus solely upon objective evidence are not particularly relevant" due to the "the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia." *Id. at 245*.

The ALJ's opinion here does not comport with *Rogers*. The ALJ partially discredited Dr. Deeb's opinions because the ALJ concluded that they were inconsistent with Plaintiff's retention of a full range of motor strength, reflexes and sensation. Yet, as the *Rogers* court noted, such findings are not indicative of the severity of a claimant's fibromyalgia as fibromyalgia patients often exhibit these manifestations. *See id.* at 244; *Kalmbach v. Comm'r of Soc. Sec.*, 409 F.

16

App'x 852, 861-62 (6th Cir. 2011).  Thus, it was not proper for the ALJ to discount Dr. Deeb's opinion based upon his consideration of these factors.  They simply are not relevant in terms of evaluating the degree of a claimant's fibromyalgia pain.

Although the ALJ also discounted Dr. Deeb's opinion based upon its inconsistency with Plaintiff's ability to perform various daily tasks, this explanation is not sufficient enough to nullify the ALJ's prior error.  The ALJ contrasted Dr. Deeb's findings with Plaintiff's ability to perform routine tasks such as chores, cooking, driving and shopping.  But, the ability to perform these types of tasks is not tantamount to Plaintiff being able to perform typical work activities.  *See id*. at 248-49.  Thus, Plaintiff's retention of the ability to complete these routine tasks would not have provided a sufficient basis for which the ALJ to disregard Dr. Deeb's findings.

Likewise, the ALJ should not have relied upon the opinion of state agency physician, Dr. Jon Starr to discount Dr. Deeb's conclusions.  Dr. Starr opined that Dr. Deeb's opinion was not supported by Dr. Deeb's objective findings or by any other consultant's objective findings.  The ALJ gave full weight to Dr. Starr's opinion and credited Dr. Starr's criticisms of Dr. Deeb's opinion.  But, this critique of Dr. Deeb's findings is not proper given Plaintiff's diagnosis of fibromyalgia.  Dr. Starr's rejection of Dr. Deeb's findings was based solely upon the lack of objective evidence in the record substantiating Dr. Deeb's claims.  Because fibromyalgia cannot be objectively diagnosed or verified, the lack of objective evidence in the record does not speak to whether Dr. Deeb's findings are sound.  Accordingly, to the extent that the ALJ relied upon Dr. Starr's opinion in rejecting Dr. Deeb's findings, she erred.

This is not to suggest that Plaintiff's mere diagnosis of fibromyalgia rendered her disabled.  It is well-established that there are individuals who suffer from this ailment who retain the ability to be gainfully employed.  *See Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806

(6th Cir. 2008) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [claimant] is one of the minority.").  Rather, the Court's ruling today acknowledges the scrutiny applicable in cases wherein the claimant alleges that he/she is disabled due to the pain and other symptoms caused by this condition.  The undersigned recognizes that Dr. Deeb's conclusions were not solely based upon Plaintiff's diagnosis of fibromyalgia, but also contemplated her diagnosis of peripheral neuropathy and OCD as well.  However, Plaintiff's fibromyalgia clearly impacted the doctor's findings and his opinion should have been better evaluated by the ALJ.

Finally, the undersigned notes that the ALJ somewhat mischaracterized the ME's testimony.  The ALJ indicated that Dr. Newman found Dr. Deeb's opinion to be unsupported by the evidence, but the record does not bear this out.  The ME acknowledged Dr. Deeb's diagnosis of fibromyalgia, and found that this ailment would constitute as a severe impairment.  However, the ME testified that due to the elusive nature of the disorder, he did not know how to evaluate the intensity or severity of the disease.  Though the ME's opinion that Plaintiff could perform light work conflicted with Dr. Deeb's assessment of Salsgiver's limitations, it did not suggest that the ME found Dr. Deeb's opinion to be "unsupported".

### 2.  Dr. Duterte

In examining Dr. Duterte's findings on Plaintiff's mental capacity, the ALJ did not specify how much weight he attributed to the doctor's findings.  However, the ALJ indicated that Dr. Duterte's opinion was consistent with the record evidence, and that it was reflected in the ALJ's RFC finding for the period beginning on July 2, 2007.  The ALJ's RFC for this time

period restricted Plaintiff to "non-public low-stress jobs with no more than superficial interaction with supervisors, co-workers, and the public."  (Tr. 21).

Salsgiver argues that Dr. Duterte's findings on her mental capacity – namely those in which he rated her as having "poor or no ability" – were not incorporated into the ALJ's RFC finding covering the latter period under review.  She contends that Dr. Duterte essentially precluded her from working in coordination with others, handling *any* work stress and from being able to complete a normal workday or workweek.  But, she argues that the ALJ's latter RFC did not recognize that she could not withstand *any* stress because the ALJ indicated that she could tolerate *low* stress jobs.  Moreover, Salsgiver contends that the ALJ did not give any weight to Dr. Duterte's finding that she would not be able to complete a normal workday or work week or perform at a consistent pace without an unreasonable number and length of rest periods.  Salsgiver contends that the ALJ's failure to consider these excerpts from Dr. Duterte's opinion was harmful to her because the VE testified that neither a person who was off task 20 percent of the day, nor a person who missed five to six days of work per month would be able to maintain competitive employment.

The Commissioner argues that the ALJ's statement that Dr. Duterte's opinion was consistent with the evidence *must have* only been referring to those portions of Dr. Duterte's opinion which were consistent with the ALJ's RFC finding.  Defendant asserts that this conclusion is evident because the ALJ assigned full weight to the opinions of the two state agency physicians who evaluated Plaintiff's mental capacity and concluded that she could perform "non-public, low-stress tasks."  The Commissioner also argues that Plaintiff's ability to attend school and care for her minor child undercut Dr. Duterte's more restrictive findings.

Defendant's arguments are flawed.  To begin, it is not evident to the Court that the ALJ intended to reject any portion of Dr. Duterte's opinion.  Though the Commissioner argues that the ALJ's acceptance of the two state agency physicians' opinions evidences that the ALJ only intended to accept certain portions of Dr. Duterte's opinion, the ALJ's opinion states otherwise.  The ALJ indicated that he credited Drs. Stailey-Steiger and Haskins' opinions regarding Salsgiver's mental capacity for the period *prior* to July 2, 2007.  In contrast, he commented that Dr. Duterte's opinion was consistent with the evidence reflecting Salsgiver's mental condition *beginning* July 2, 2007 an onward.  Accordingly, the ALJ credited both sets of opinions, but for two different time periods.  Thus, his acceptance of one, was not necessarily a rejection of the other.

Furthermore, the latter RFC announced by the ALJ covering the period beginning July 2, 2007, appeared to be an attempt by the ALJ to accommodate the additional limitations announced by Dr. Duterte.  For example, with regard to Plaintiff's mental capacity after July 2, 2007, the ALJ's RFC included the additional restriction that Plaintiff's work involve no more than superficial interaction with supervisors, co-workers and the public.  This would appear to reflect Dr. Duterte's finding that Plaintiff had "poor or no" ability to work in proximity with others.  Similarly, in both RFC assessments the ALJ noted that Plaintiff was limited to "low-stress tasks".  Arguably, although not explicitly decided today, this restriction *could* be viewed as consistent with Dr. Duterte's ruling that Salsgiver had "poor or no" ability to tolerate work stresses.  However, the Court cannot see how the ALJ's latter RFC assessment incorporated Dr. Duterte's notation that Plaintiff had "poor or no" ability to complete a normal workday or work week without an unreasonable number and length of breaks.

This issue is important because, as Plaintiff noted, the VE testified that a person who would be off task 20 percent of the time or who would be absent five to six days a week, would not be able to maintain competitive employment.  Though Dr. Duterte did not opine on the specific number or length of rest periods that Salsgiver would need, his findings indicate that whatever the number, it would be more than what could normally be expected.  The ALJ's acceptance or rejection of this portion of Dr. Duterte's opinion was therefore critical to the ALJ's disposition of Plaintiff's applications for benefits.

While the Commissioner supplied a host of plausible reasons why the ALJ may have decided to discount Dr. Duterte's findings for the areas in which he found Salsgiver to possess "poor or no" ability, the Court cannot accept these justifications *post hoc*.  *See S.E.C. v. Chenery*, *332 U.S. 194, 196, 67 S.Ct. 1575, 1577 (1947)* (finding that a reviewing court must judge the propriety of agency action "solely by the grounds invoked by the agency").  The ALJ gave no indication that he rejected any portion of Dr. Duterte's opinion.  In fact, he explicitly noted that he found the doctor's opinion to be consistent with the evidence in the record regarding Plaintiff's overall condition after July 2, 2007.  Either the ALJ failed to account for this portion of Dr. Duterte's opinion, or, he purposely withheld this finding from his RFC without providing any explanation.  Regardless, the ALJ's conduct was in error as Dr. Duterte was one of Plaintiff's examining physicians, and this portion of the doctor's opinion is clearly inconsistent with the ALJ's ultimate ruling.

### B.  ALJ's Application of *Drummond*

Prior final decisions of the Commissioner which were not appealed are binding upon the parties.  *Casey v. Sec'y of Health & Human Servs.*, *987 F.2d 1230, 1232 (6th Cir. 1993)*.  Thus, "Social security claimants are bound by the principles of res judicata."  *Drummond v. Comm'r of*

_Soc. Sec._, 126 F.3d 837, 841 (6th Cir. 1997).  In _Drummond_, the Sixth Circuit held that the Commissioner is bound by its prior findings with regard to a claimant's disability application unless new evidence or changed circumstances require a different finding.  _Id._ at 842; AR 98-4(6), 1998 WL 283902, at *2-3.  Social Security Acquiescence Ruling 98-4(6) therefore mandates that:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 WL 283902, at *3.

It is the claimant's burden to present evidence showing that her symptoms have changed since the time of the Commissioner's prior determination obviating the application of the ruling in _Drummond_.  _Casey_, 987 F.2d at 1232-33.  "Plaintiff must not merely present new and material evidence, but that evidence must show that plaintiff's condition _deteriorated_ from the state of her condition at the time the ALJ made the decision."  _Drogowski v. Comm'r of Soc. Sec._, No. 10-12080, 2011 WL 4502988, at *8 (E.D.Mich. July 12, 2011) (emphasis in original) (_citing Casey_, 987 F.2d at 1232-33), _R&R adopted_, 2011 WL 4502955.  Thus, a prior ALJ's ruling that a claimant is capable of working is binding upon a subsequent ALJ unless the claimant can show that her symptoms have worsened since the time of the prior ALJ's decision.  The Ninth Circuit, which also uses this standard, refers to it as the "presumption of continuing non-disability".  _Chavez v. Bowen_, 844 F.2d 691, 693 (9th Cir. 1988).

In the case _sub judice_, the ALJ stated that she was applying the ruling in _Drummond_ to Plaintiff's applications for benefits for the period beginning with Salsgiver's onset date through

July 1, 2007, because there was no evidence of a change in Plaintiff's condition until July 2, 2007.  The ALJ noted that the prior ALJ found Plaintiff's fibromyalgia, panic disorder, OCD, and alcohol abuse to be severe impairments, but nonetheless ruled that Salsgiver retained the ability to perform light work involving low stress tasks and no contact with the public.  However, aside from these cursory statements, the ALJ provided no further discussion of how she concluded that Plaintiff's symptoms had not worsened in the approximate three years from the prior ALJ's ruling until July 1, 2007.

Plaintiff identified records which she alleges proves that her symptoms had worsened during this period.  For instance, Plaintiff notes that she was seen in the emergency room several times for chronic pain, and experienced increased problems with her other ailments such as anxiety, radicular pain, and anhedonia.  Although the Commissioner identified records which undermine Plaintiff's claims of worsened symptoms, the overwhelming majority of the evidence identified by Defendant is immaterial because it refers to Salsgiver's condition *after* July 2, 2007.

Though the prior ALJ only held Salsgiver's fibromyalgia, panic disorder, OCD, and alcohol abuse to be severe impairments, the instant ALJ also found Plaintiff's degenerative disc disease, major depressive disorder, anxiety disorder, and eating disorder to be severe impairments during this period of time.  While the Court acknowledges that an ALJ's determination at step two of the disability evaluation process is judged under a *de minimis* standard, the ALJ's recognition of these additional severe impairments suggests that Plaintiff's overall condition had further deteriorated to some degree since the prior ALJ's ruling.  In light of this, and the other evidence identified by Plaintiff, the ALJ should have provided some explanation as to why she found Plaintiff's condition to remain unchanged during this timeframe.

Without such explanation, the Court is unable to discern why the ALJ rejected the evidence presented by Plaintiff in concluding that her condition had not deteriorated to the point where the application of the ruling in *Drummond* would have been inapplicable.

## X.  DECISION

For the foregoing reasons, the Court finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the Court VACATES the decision of the Commissioner and REMANDS the case to the Social Security Administration.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  June 20, 2012.